# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00576-CV

---

### E. H., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 340TH DISTRICT COURT OF TOM GREEN COUNTY
### NO. C200064CPS, THE HONORABLE GARY L. BANKS, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

E.H. (Mother) appeals from the trial court's final order terminating her parental rights to her three children.[1] Mother raises a jurisdictional challenge, asserts procedural errors, and contends that the evidence is legally insufficient to support the trial court's termination findings. *See* Tex. Fam. Code § 161.001(b)(1)(N), (O), (2). For the following reasons, we will affirm the trial court's order of termination.

### BACKGROUND AND SUMMARY OF THE EVIDENCE

The Texas Department of Family and Protective Services filed an "Original Petition for Protection of a Child, Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship" on April 15, 2020. The petition alleged that there was an "immediate danger to the physical health or safety" of Mother's three children—Arnold (age seven at the

---

[1] For the children's privacy, we refer to them and other family members by pseudonyms. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

time of trial), Vanessa (age seven at the time of trial), and Caden (age three at the time of trial)—and that their continued presence in the home "would be contrary to the[ir] welfare."[2] Attached to the petition was an Affidavit in Support of Removal in which Francis Lawson, a Child Protective Services (CPS) Investigator, averred that the Department had received reports that Mother was using methamphetamine daily and was "screaming at [her three] children and physically slapping her one year old son on [the] legs excessively while she was under the influence." After the Department removed the children from Mother's care, it placed them in a foster home together. A trial to the court was conducted on September 22, 2021.

### Evidence admitted at trial

Mother's family service plan, which was approved by and made an order of the court, was admitted at trial. The plan required Mother to maintain stable housing free from criminal activities, maintain monthly contact with her caseworker, allow home visits by the Department, maintain full-time employment, complete parenting classes and provide the Department with proof thereof, complete a drug and alcohol assessment and follow its recommendations, refrain from illegal drug use, submit to drug tests as requested and test negative, complete a psychological evaluation and follow its recommendations, complete individual counseling, and develop a safety network of people who can assist with providing child care.

---

[2] The children were living with Mother at the time of removal. The whereabouts of Caden's father were unknown, and the father of Arnold and Vanessa was an inmate at the "Nebraska Diagnostic and Evaluation Center." The trial court terminated both fathers' parental rights, but neither father is a party to this appeal.

*The caseworker's testimony*

Trey Davis, the Department's caseworker assigned to Mother's case, testified that Mother did not complete any of her service plan. He stated that he had never met Mother personally despite multiple attempts because Mother would not respond to his texts or emails or answer the door when he made visits to her home, including the first scheduled home visit to which the parties agreed at an early hearing. He had attempted to make unannounced visits once or twice a month throughout the case and had attempted monthly to schedule announced visits with Mother to no avail. He therefore had been unable to determine whether Mother's home was safe and appropriate for the children. Davis testified that Mother was informed about and invited to a meeting at which she would have been involved in the creation of her service plan (i.e., a permanency conference), but she did not attend, forcing the Department to create a plan for her, which she later signed.

Davis further testified that he attempted to contact Mother to discuss with her alternate, remote ways to complete parenting classes, including the completion of "parenting packets" requiring quizzes and discussion with him, but Mother did not respond to his attempts or ever contact him. Mother attended only a total of three or four visitations with her children, with the last one being a virtual visit in June or July 2021, after which point the visitation supervisor "lost contact with" Mother. The last in-person visitation was in February 2021. Mother had not contacted Davis over the past three or four months before trial to set up visitation, had not had a "meaningful relationship" with her children in the past six months, and had never provided the Department with any cards, letters, clothing, or gifts to give to her children. The Department had initially transported Mother to the visitations (the children's foster

3

home was near Dallas), but the Department ceased offering to do so due to Mother's canceling visitations or no-showing and later due to Mother's acquiring her own vehicle.

Davis explained that Mother did not complete the required drug and alcohol assessment, which the Department required because of Mother's methamphetamine-positive test at the beginning of the case and "history of cases that involved drug use." He testified that Mother never took any other drug tests that he requested of her except the one during the Department's initial investigation in February or March 2020 (when Mother tested positive for methamphetamine), including one he requested of her within the last month before trial. Therefore, he was unable to determine whether she had abstained from illegal drug use as required by her service plan.

As for the required psychological examination, Davis testified that although the Department scheduled an appointment for Mother with a provider, the provider informed him that Mother had canceled the appointment saying she "no longer required it" because she was "relinquishing" her parental rights (although she never told Davis that). Mother never contacted Davis to reschedule the psychological examination. Although the Department arranged individual counseling with a therapist, Mother never attended, and Davis was unable to follow up with Mother about why because Mother never responded to his attempted contacts. Mother never provided Davis with the names of individuals she considered to be part of her "safety network" to support her with her parenting. Although Mother provided Davis with the name of a person who might be able to care for her children, the Department conducted a home study on that person, and the home was not approved.

Davis testified that it would be in the children's best interest for Mother's parental rights to be terminated because she had not demonstrated that she was drug free; could provide a

4

safe, stable, and appropriate home for the children; or had alleviated the issues that caused the Department to initiate this case. The Department planned for the three children to be adopted by their current foster home, at which the two older children had lived for over a year and the youngest had lived since July. The foster home was a large home "out in the country." The two older children were attending school and doing well, despite Arnold's having had to do some "catch up" because he had "never attended school prior to coming into [foster] care." The foster home would offer the children stability and was able to provide for their needs. The children had expressed to Davis that they like being in the foster home and would like to stay there and together, although Caden (who was only three) did not express "much of a wish." Davis stated that the children were "very happy where they're at" and were doing "very well" and much better than they had been doing when they came into the Department's care. The Department "looked into" Mother's allegation that the children's clothing provided by the foster home was shabby and ill-fitting but determined that although the clothing "wasn't super flashy," there was "nothing wrong" with it; moreover, Vanessa "was upset because [Mother] didn't like her clothing" despite the child "personally pick[ing it] out" for Mother. Davis explained that these three children especially need stability because they "have had several CPS cases in the past," including prior "safety placements." He said that Mother has had between ten and twelve prior CPS cases, although this was the first one in which the children had been removed. He explained that he had "received so few responses" from Mother and that she "very rarely responds to" him such that he was unable to gauge if Mother had been truthful in her responses.

### Mother's testimony

While testifying, Mother explained her understanding of why the Department had become involved with her and her children: The Department had received a report that Mother's

5

"son had stepped on a thumb tack" and that Mother was using drugs and leaving her children with random people. She further explained that the Department's petition alleged that her children were removed because she "was spanking" her son Caden "repeatedly on the leg." She testified that she had not spanked Caden on the leg and had never spanked him "for any reason other than discipline." Mother denied actively using drugs, leaving her children with random people, and neglecting her children medically (she noted that the Department's "paperwork" indicated she had medically neglected Caden and neglectfully supervised Arnold and Vanessa). Mother explained that when her children were removed, she and the children were living in a two-bedroom home that had been "approved by the Department" during a Family-Based Safety Services [FBSS] CPS case that was pending from 2019 until early 2020. She testified that the FBSS case had been initiated because of an allegation of her neglectful supervision of Caden, which was "ruled out."

She explained that she had been "coerced" to sign the family service plan but that she did not agree with all its requirements. She stated that she last took a drug test for the Department in April 2020 and that, although she did not see the results until three or four months later, the results "said that [she] was positive" for methamphetamine even though she was "not using any drugs at all." She could not remember when the Department last "demanded" she take a drug test, although she believed it might have been in the last month. She stated that she often receives the Department's drug-test demands too late because she doesn't check her emails often and does not communicate with CPS "unless it is through [her] attorney." She explained that she had taken "plenty of drug screens over the past eight years for the Department," which "speak for themselves."

Mother admitted that she had not completed "any services" on her service plan but explained that the psychological evaluation "was canceled by the psychologist" and parenting classes "have not been provided" because Department offices had been closed due to COVID-19. Nonetheless, she had "applied to a high school equivalency program" and had "applied to several different employment jobs." When asked whether she had, over the last year and a half, done any "personal development" outside of the Department's requirements, Mother responded that she had not, except for the GED application and job search. Mother explained that she had contacted the Texas Workforce Commission about receiving unemployment benefits but was awaiting paperwork from the agency. She had no source of income and was relying on a "benefits program" to feed herself. Mother stated that she did not attempt to reschedule her psychological examination after it was canceled, and she never allowed the caseworker to visit her in her home. When she attempted to schedule the drug and alcohol assessment required by her service plan, she was informed that the office was not scheduling walk-in assessments but had a waiting list; Mother did not ask to be placed on the waiting list.

Mother stated that if her parental rights were going to be terminated, then "hurry up and do it because this is just a waste of my time, sitting here arguing with y'all over shit that y'all are lying about." Mother testified that she last visited her children in February 2021. Since then, she'd had a "vehicle accident" and, because her car had been "totaled," she had been unable to see her children. Although she spoke with a Department representative about scheduling virtual visitations, she had not heard anything since May or June because the Department communicated with her via email instead of phone, knowing that she does not check email often. Her communications about visitation were with "Shelby" at the Department, who "handles visitations," rather than with her caseworker Davis. Mother acknowledged that it was

7

her responsibility to ensure visitations occurred. Mother explained that she never asked Davis for "parenting packets" as an alternate way to complete her parenting-class requirement because she had only recently learned that it was an option instead of the in-person classes, which had not been occurring due to the Department's offices being closed.

Mother testified that her "entire family is very estranged" and that she does not have regular communication with anybody in her extended family. She also explained that she stays to herself, because "people are nothing but drama," and that she has "maybe one friend" that she communicates with, but "not very often."

Mother testified that when she saw her children in February 2021, Vanessa had told her that she was very sad and "didn't feel comfortable in her foster home," that the foster mother "yelled at her to the extent where she didn't feel safe," and that she and her brothers had to do chores that they physically could not do because "they're too small to do them." She explained that the children otherwise "seemed relatively fine" but were wearing ragged, ill-fitting clothes and did not have good hygiene. Mother testified that Vanessa and Arnold had attended Blackshear Head Start school in 2017 and 2018. When asked what would change in the interim were the court to grant a trial continuance, Mother responded that "if the Department" would allow in-person parenting classes and "find a different psychologist" for her evaluation, then she would be able to complete those two requirements.

## STANDARD OF REVIEW

To terminate a parent's rights to her children, the Texas Department of Family and Protective Services must prove by clear and convincing evidence that the parent engaged in conduct amounting to a statutory ground for termination under section 161.001 and that

8

termination is in the children's best interest. *Id.* § 161.001(b); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). We defer to the factfinder, who, "having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). In reviewing legal sufficiency, we consider undisputed evidence contrary to the finding but assume the factfinder resolved disputed facts in favor of its finding. *A.C.*, 560 S.W.3d at 630-31. Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the factfinding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true. *Id.* at 631.

We consider a trial court's finding on best interest in light of the factors set out in *Holley v. Adams*: the children's wishes, if appropriate given the children's ages; the children's emotional and physical needs now and in the future; present and future emotional or physical danger posed to the children; the parenting skills of those seeking custody; any programs available to assist those seeking custody to promote the children's best interest; plans for the children's future; the stability of the home or proposed placement; conduct by the parent that might show that the parent-child relationship is inappropriate; and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976). The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

9

**DISCUSSION**

*Whether the trial court had personal jurisdiction over Mother*

In her third issue, Mother argues that because she was never served with process, the trial court did not have personal jurisdiction over her and that her constitutional right to due process was violated.[3]  *See In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012) ("Personal jurisdiction, a vital component of a valid judgment, is dependent 'upon citation issued and served in a manner provided for by law.'" (citation omitted)).  Whether personal jurisdiction exists is a question of law that we review de novo.  *See Old Republic Nat'l Title Ins. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018).

While Mother is correct that the record contains no evidence that the Department served her with process, a party can waive defects in service by entering a general appearance.  *See* Tex. R. Civ. P. 120 (providing that general appearance has "the same force and effect as if the citation had been duly issued and served as provided by law"); *Baker v. Monsanto Co.*, 111 S.W.3d 158, 161 (Tex. 2003) (noting that entering "general appearance in action waives any defect in the manner of service"); *N.J. v. Texas Dep't of Fam. & Protective Servs.*, 613 S.W.3d 317, 321 (Tex. App.—Austin 2020, pet. granted) (noting that when party makes general appearance, such as personal appearance in court or filing of answer, party is considered to have consented to personal jurisdiction and to have waived any complaint as to service); *In re M.D.M.*, 579 S.W.3d 744, 758 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("[A] party waives a complaint regarding service of process if he makes a general appearance.").

Filing an answer, as Mother's appointed counsel did here, constitutes a general appearance.  *See* Tex. R. Civ. P. 121 ("An answer shall constitute an appearance of the defendant

---

[3] We address this issue first because it implicates the trial court's jurisdiction.

so as to dispense with the necessity for the issuance or service of citation upon him."); *In re A.L.H.*, 515 S.W.3d 60, 87–88 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (holding that answer filed by father's attorney ad litem in parental-termination case was general appearance, which waived all complaints about service); *In re D.M.B.*, 467 S.W.3d 100, 103 (Tex. App.—San Antonio 2015, pet. denied) (same). In addition to filing an answer, Mother filed an affidavit of indigency requesting appointment of counsel, personally appeared at hearings, filed discovery requests, and filed motions requesting affirmative relief (for instance, a motion to change the children's placement). These actions further support waiver of any objection to a failure of service of process. *See Dawson-Austin v. Austin*, 968 S.W.2d 319, 321–22 (Tex. 1998) ("The test for a general appearance is whether a party requests affirmative relief inconsistent with the assertion that the trial court lacks jurisdiction."). We accordingly overrule Mother's third issue.

### *The trial court's denial of Mother's request for a jury trial*

In her first issue, Mother contends that the trial court abused its discretion in denying her request for a jury trial, which ruling we review for abuse of discretion. *See In re A.L.M.-F.*, 593 S.W.3d 271, 282 (Tex. 2019); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). The test for abuse of discretion is whether the trial court's decision was "arbitrary, unreasonable, and without reference to guiding principles." *A.L.M.-F.*, 593 S.W.3d at 282 (quoting *Mercedes-Benz Credit Corp. v. Rhyne*, 925 S.W.2d 664, 666 (Tex. 1996)).

To perfect one's right to a jury trial in a civil case, the Rules of Civil Procedure require that a jury demand be filed in writing within "a reasonable time before the date set for trial of the cause on the non-jury docket, but not less than thirty days in advance." Tex. R. Civ. P. 216; *E.E.*, 598 S.W.3d at 396. Although Mother's motion requesting a jury trial was untimely

11

because it was filed only nineteen days before trial, she did not necessarily lose her right to a jury trial, as the supreme court has held that even when a jury demand is untimely, "a trial court should accord the right to jury trial if it can be done without interfering with the court's docket, delaying the trial, or injuring the opposing party." *E.E.*, 598 S.W.3d at 396–97 (quoting *General Motors Corp. v. Gayle*, 951 S.W.2d 469, 476 (Tex. 1997)).

At the September 22, 2021 bench trial, the trial court pronounced the following findings, which it recited in its Order Denying Request for Jury Trial Setting: no other request for a jury trial had been filed in the case, Mother's request was untimely under Rule 216, the dismissal date had already been extended once, the case was set for automatic dismissal on October 16, the trial court's docket between September 22 and October 16 was "completely fil[l]ed with settings in other cases which preclude any time for the Court to conduct a jury trial," and "setting a jury trial within the current extended dismissal date for the case cannot be done without interfering with the Court's docket and delaying the trial of this case." On this record and in light of these findings, we cannot conclude that the trial court's ruling was arbitrary, unreasonable, or without reference to guiding principles. *See S.B. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00373-CV, 2020 WL 7414728, at *2–3 (Tex. App.—Austin Dec. 18, 2020, no pet.) (mem. op.) (concluding that trial court did not abuse discretion in denying untimely jury demand given evidence that granting demand would have significantly delayed trial, prejudiced Department, and been contrary to children's best interest).

Within this same issue, Mother contends that her "due process rights were erroneously violated when she was denied . . . the right to confront her witnesses in a live hearing" and that she was entitled to an in-person, live trial under the Sixth Amendment's Confrontation Clause instead of the remote trial via Zoom video conference that the trial court

12

conducted due to the COVID-19 pandemic. *See* U.S. Const. amend. VI. However, the Sixth Amendment applies only to criminal trials, and Mother does not cite to any authority applying it to termination proceedings. *See E. N. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00014-CV, 2021 WL 2460625, at *3 (Tex. App.—Austin June 17, 2021, no pet.) (mem. op.) (noting that Confrontation Clause does not apply to termination cases).

Within this same issue Mother also complains about the trial court taking judicial notice that the "Covid testing numbers [in Tom Green County] [we]re in excess of 10 percent" and that in-person proceedings were thus precluded per the county's COVID-19 court-operating plan. However, Mother concedes that she did not object to the alleged error and thus did not preserve it. *See* Tex. R. App. P. 33.1. Nonetheless, she argues, the trial court's taking judicial notice of the allegedly inaccurate positivity rate to deprive her of an in-person trial is "fundamental error" for which she did not need to preserve error. We disagree. *See Cox v. Johnson*, 638 S.W.2d 867, 868 (Tex. 1982) (per curiam) ("Fundamental error survives today only in those rare instances in which the record shows on its face that the court lacked jurisdiction or that the public interest is directly and adversely affected as that interest is declared in the statutes and constitution of this state."); *see also In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005) ("[R]ules governing error preservation must be followed in cases involving termination of parental rights as in other cases in which a complaint is based on constitutional error."); *In re B.L.D.*, 113 S.W.3d 340, 350–51 (Tex. 2003) (stating that fundamental-error doctrine does not apply to procedural-preservation rules, nor does due process require appellate review of unpreserved complaints in parental-rights-termination cases). We accordingly overrule Mother's first issue.

### *The trial court's denial of Mother's request for a continuance*

In her second issue, Mother contends that the trial court abused its discretion in denying her request for a continuance, which request she made in open court at the start of trial. *See Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004) (reviewing trial court's denial of motion for continuance for abuse of discretion and describing abuse-of-discretion standard of review). Trial courts may not grant a continuance "except for sufficient cause supported by affidavit, or by consent of the parties, or by operation of law." Tex. R. Civ. P. 251. Mother's request was not in writing supported by an affidavit, and the Department and children's attorney ad litem opposed her request. When a motion for continuance does not comply with Rule 251, "reviewing courts generally presume that the trial court did not abuse its discretion in denying the motion." *Sheen v. Sheen*, No. 03-18-00358-CV, 2019 WL 2554570, at *2 (Tex. App.—Austin June 21, 2019, no pet.) (mem. op.).

Despite her failure to comply with Rule 251, Mother argues that the trial court should have continued the trial because she recently "had a month-long illness due to Covid-19 and was not prepared" for trial and had been "unable to confer" with her attorney. The trial court permitted Mother to testify in support of her motion for continuance. Mother testified that she was diagnosed at the emergency room (ER) with COVID-19 on August 29, 2021, and was told to quarantine for two weeks; she had gone to the ER because she was experiencing a lack of smell and taste, nausea, fever, and body aches; she was not hospitalized or intubated and did not lose the ability to speak; her symptoms lasted between fifteen and twenty days but that they were "severe enough to where [she] was in bed for almost a month, sick, couldn't hardly move, couldn't stay awake, but not severe enough to be hospitalized." She testified that she was unable to "operate her phone" during the period because she spent "90 percent of [her] time asleep, in

14

pain" and that, while she was not prescribed any medication, she took over-the-counter relief that "kept [her] mostly sedated" and asleep "so much." On redirect examination, Mother answered "yes" to her attorney's question of whether she was asking that the trial "be continued for delay." Mother also explained that she had been in contact with her grandmother, presumably via telephone, for assistance with obtaining over-the-counter medicine and transport to the ER. When asked about what relevant changes might occur during a period of a continuance, Mother stated that she might be able to do some in-person parenting classes if the Department were to allow the classes in such format and that she might be able to complete her psychological evaluation if the Department were "willing to find [her] a different psychologist."

After Mother testified, the trial court heard from the children's attorney ad litem, who opposed the continuance. The ad litem stated that nothing had changed in the case in "a year and a half," much less in the weeks leading up to trial, that would have had any substantial effect on Mother and her counsel's ability to prepare for trial. The trial court, in denying the motion for continuance, noted that Mother's appointed counsel had been representing her since November 2020 and that there had been "more than [adequate] time to prepare for trial." As discussed above, the case had already been extended once from its one-year dismissal date, and the extended dismissal date was within just a few weeks of the trial setting. And Mother herself admitted that she was seeking the continuance "for delay," to the extent that she understood the legal effect of that statement. Furthermore, the parties had been provided with notice of the September 22 trial setting since June 17, 2021, which gave Mother and her attorney ninety-seven days' notice of the setting. On this record, we cannot conclude that the trial court abused its discretion in denying Mother's motion for continuance.

*Legal sufficiency of the evidence*

In her fourth and fifth issues, Mother respectively contends that the evidence is legally insufficient to support the trial court's subsection (N) and best-interest findings. *See* Tex. Fam. Code § 161.001(b)(1)(N), (2). However, the trial court made an additional statutory-predicate finding—supporting termination of Mother's rights under subsection (O), *see id.* § 161.001(b)(1)(O)—and Mother did not challenge that finding on appeal. Because this unchallenged finding, along with the best-interest finding, is sufficient to support termination, we need not decide whether there is legally sufficient evidence with respect to subsection (N). *See* *T.A.W. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00364-CV, 2021 WL 81866, at *4 (Tex. App.—Austin Jan. 8, 2021, pet. denied) (mem. op.); *Toliver v. Texas Dep't of Fam. & Protective Servs.*, 217 S.W.3d 85, 102 (Tex. App.—Houston [1st Dist.] 2006, no pet.). We overrule Mother's fourth issue.

As to the trial court's best-interest finding, we conclude that the evidence is legally sufficient to support the trial court's finding that termination of Mother's rights to her children was in their best interest. *See A.C.*, 560 S.W.3d at 630-31. The caseworker testified that the older two children expressed the desire to stay in the foster home and that the foster parents were hoping to adopt all three children. The children were doing well in the foster home and had caught up in school after coming into foster care academically behind. The children's emotional and physical needs would continue for many years because they were relatively young (Caden was only three at the time of trial), and the children would be vulnerable to harm if Mother was unable or unwilling to meet their needs long term. *See In re R.R.*, No. 04-16-00268-CV, 2016 WL 4772347, at *5 (Tex. App.—San Antonio Sept. 14, 2016, no pet.) (mem. op.). From Mother's repeated failures to engage in her court-ordered services, visit her children

16

(including her admission that she had not visited with her children for the seven months before trial even though it was her responsibility to ensure visitations occurred), and stay in contact with her caseworker the trial court could reasonably have inferred that she would not adequately meet her children's long-term physical and emotional needs if her children were returned to her care. *See In re A.S.*, No. 02-16-00284-CV, 2017 WL 371496, at \*6 (Tex. App.—Fort Worth Jan. 26, 2017, pet. denied) (mem. op.) (noting that parent's failure to visit child during six months preceding trial indicates parent would not meet child's physical and emotional needs in future).

From Mother's illegal-drug use at the beginning of the case and her refusal to submit to further drug testing, the trial court could have inferred that she continued to use drugs throughout the case even though her parental rights were subject to termination. *See S.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-20-00039-CV, 2020 WL 3892796, at \*16 (Tex. App.—Austin July 10, 2020, no pet.) (mem. op.) (explaining that illegal-drug use supports finding that termination is in child's best interest and that "factfinder may give great weight to this significant factor"); *In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.) (noting that factfinder may reasonably infer from parent's refusal to take drug test that parent was using drugs).

Mother did not articulate any plans for her children's future or for her parenting of them if they were returned to her, while the caseworker testified that the children were doing well in the foster home and would likely be adopted by that family. Mother had not demonstrated that she had stable employment and testified that she had no source of income and was completely reliant on a "benefits program" to feed herself. The trial court could have inferred from the caseworker's testimony about Mother's long CPS history and the children's prior safety placements that returning the children to Mother's care would jeopardize their need

17

for stability and permanence, which are paramount. *See In re F.M.E.A.F.*, 572 S.W.3d 716, 726 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) ("A child's need for permanence through the establishment of a stable, permanent home is the paramount consideration in a best-interest determination."). While there was little evidence of Mother's parenting skills, the trial court could have inferred from her unwillingness to avail herself of any of the programs offered by the Department or to provide any information about her home's propriety for children or her parenting abilities that she neither had adequate capabilities and resources nor was open to seeking out support and resources in the future should she need them, especially considering the lack of a social support system about which Mother testified. *In re W.E.C.*, 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.) (noting that factfinder can infer from parent's failure to avail herself of programs offered by Department that parent "did not have the ability to motivate herself to seek out available resources needed . . . now or in the future").

Mother has a history of Department involvement, including an FBSS case that ended just before this case began, but she nonetheless could not articulate any significant efforts she had made during the eighteen months that this cause was pending to demonstrate to the Department that she could provide a safe, stable, and appropriate home for the children and meet their present and ongoing emotional and physical needs. Her failure to maintain contact with her children—through missed visitations and lack of effort to foster a meaningful connection with them through other means—and her failure to demonstrate that she was not actively using illegal drugs weigh in favor of a finding that the parent-child relationship is not a proper one. Viewing the evidence under the legal-sufficiency standard of review, we conclude that the trial court could have formed a firm belief or conviction that terminating the parental rights of Mother

18

was in her children's best interest. *See* Tex. Fam. Code § 161.001(b)(2); *A.C.*, 560 S.W.3d at 630–31. We accordingly overrule Mother's fifth issue.

## CONCLUSION

Having overruled Mother's issues, we affirm the trial court's order of termination.

_____

Thomas J. Baker, Justice

Before Justices Goodwin, Baker, and Triana

Affirmed

Filed:  April 5, 2022